Arthur BROWN, et al., Plaintiffs,

v.

LOUDOUN GOLF AND COUNTRY CLUB, INC., et al., Defendants.

Civ. A. No. 83–0603–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 17, 1983.

Jaclyn Leonard, Hall, Surovell, Jackson & Colten, P.C., Fairfax, Va., for plaintiffs.

Robert W. Ahrens (local counsel), Leesburg, Va., Pamela S. Horowitz, Steven E. Vagle, Morgan Associates, Chartered,

Washington, D.C., for defendants Loudoun/Bogle.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

In June of 1982 James Bogle, the golf professional at defendants' golf club, ejected a foursome from defendant's golf course because one of the four, plaintiff Arthur Brown, is black. Brown was playing on the course as a guest of plaintiff Norman Green, a member of the Club. As a result of this incident, plaintiffs filed suit against the Club and James Bogle, alleging racial discrimination in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, interference with contract, and intentional infliction of emotional harm. The matter is now before the Court on defendants' motions for dismissal or, in the alternative, for summary judgment.

## FACTUAL BACKGROUND

Defendant Loudoun Golf and Country Club, Inc. operates a golf club in Purcellville, Virginia. Except when special tournaments are held, only members and their guests may use the course. The basic requirements for membership are payment of a $750.00 initiation fee,[1] the signature of two members on a written application form, and the approval of the application by the Club's board of directors. Although the Club's bylaws require "good moral character", plaintiffs contend that the Club does nothing to enforce this provision apart from requiring the signatures of two current members on the application. The Club has adopted a membership ceiling of 450 members, a figure it claims to have attained in the past few months.

Fifteen years ago, possibly in response to a Department of Justice investigation into the Club's compliance with civil rights laws, the Club ended its former policy of permitting "registered guests" to use its facilities, replacing it with the current system. In 1980, the Club, which then numbered approximately 275, began a campaign to increase its membership, evidently by encouraging existing members to seek out new applicants.

It is unclear how many white applicants the Club has rejected for membership. John Rand, the Club manager, stated in his deposition that no one has been rejected since he started with the Club in March 1982. A.D. Bogle, the Club's secretary-treasurer, states in his reply affidavit that four whites were recently denied membership.

The Club, a non-profit organization, is controlled by shareholders who elect a board of directors that decides Club policy and approves membership applications. All shareholders are members. Although nonshareholder members may participate in the planning of day-to-day activities, they may not participate in the election of the board of directors.

Three times a year the Club's golf course is used for special golf tournaments. The Club donates its course to the Special Olympics and the Loudoun Memorial Hospital Golf & Tennis Classic, Inc. each once a year for a fund-raising golf tournament. The Club also holds the Middle Atlantic PGA Pro-Am Tournament, a yearly tournament in which out-of-state professionals and club members play.

The Club operates a restaurant, open only to members and their guests, and a pro shop, patronized by members, their guests and friends of the pro shop operator.

## DISCUSSION

Defendants have moved for dismissal and/or for summary judgment on several grounds. As to plaintiffs' claims under Title II of the Civil Rights Act, defendants argue that the claims are time barred, that the Club is not within Title II's coverage,

---

1. The amount of the initiation fee might have been less when the incidents in question occurred.

and that, alternatively, the Club is a "private club" exempt from Title II's provisions. As to plaintiffs' state claims, defendants urge the Court to refuse to assume pendent jurisdiction over them and, alternatively, contend that the claims should be dismissed on substantive grounds.

### I. Statute of Limitations

█ The parties agree that because Title II does not specify a time limit for bringing an action, the most analogous state statute of limitation applies. The parties disagree about which Virginia limitation is most appropriate. While defendants argue that Virginia's one year catch-all limitation for "personal actions" applies, plaintiffs maintain that the two year limitation for "personal injury" actions applies. Va.Code §§ 8.01–243, 248.

Defendants' argument is based on an amendment to Virginia's limitation provisions that became effective in 1977. Both the amended and unamended provisions distinguish between actions for "personal injuries" and "personal actions". Unlike the amended version, however, the pre-1977 provisions further divided "personal actions" into survivable actions, for which the limitation period was five years, and nonsurvivable actions, for which the applicable period was one year. The limitation period for actions for "personal injuries" has always been two years. A long line of cases, construing the pre-amendment provisions, have held that civil rights actions fall into the "personal injury" category. *See, e.g., Allen v. Gifford,* 462 F.2d 615 (4th Cir. 1972); *Hampton v. Roberts,* 386 F.Supp. 609 (W.D.Va.1974). For example, in *Almond v. Kent,* 459 F.2d 200 (4th Cir.1972), the leading pre-amendment case applying Virginia's two year "personal injury" limit to civil rights claims, the court stated:

> The right of recovery [in a § 1983 suit] depends upon federal considerations, and it is not one which is concerned with the

archaic concepts of survivability of the common law.

459 F.2d at 204. Defendants concede that plaintiffs' action would have been timely under the pre-amendment provisions. But they contend that the 1977 amendment's abolition of the survivability distinction means that civil rights actions are now appropriately deemed "personal actions." They equate "personal injury" with physical injury to the body.[2]

The caselaw undercuts defendants' position. First, although *Almond v. Kent, supra,* rests in part on the survivability distinction contained in the pre-amendment provisions, its reasoning sweeps more broadly. The *Almond* court stated that even if a civil rights suit cannot be considered a "personal injury" action as defined by Virginia courts, such a suit is:

> More important than those transitory torts for which a one year period is prescribed .... Accordingly, we think that it more properly belongs at the two-year step in Virginia's statute of limitation values.

459 F.2d at 204. This aspect of *Almond's* reasoning survived the 1977 amendment.

Second, post-amendment cases have continued to apply Virginia's two year "personal injury" limitation provision in civil rights actions, regardless of whether bodily injury was involved. *See Howard v. Aluminum Workers International Union,* 589 F.2d 771 (4th Cir.1978) (free speech claims); *Cramer v. Crutchfield,* 648 F.2d 943 (4th Cir.1981) (Fourth Amendment claims); *United Steelworkers v. Dalton,* 544 F.Supp. 291 (E.D.Va.1982).

### II. Coverage under Title II

█ Title II prohibits "any place of public accommodation" from discriminating on the basis of race. 42 U.S.C. § 2000a(a). Defendants argue that the Club is not a

---

**2.** In support of their definition, defendants cite Judge Widener's concurring opinion in *Howard v. Aluminum Workers International Union,* 589 F.2d 771, 775 (4th Cir.1978) (Widener, J., concurring). Judge Widener's theory, however, was rejected by the panel majority which followed the previous cases applying Virginia's two year limitation period to civil rights actions. *See infra.*

place of public accommodation covered by Title II.

The Act defines a place of public accommodation as, *inter alia*, "any ... place of exhibition or entertainment" whose "operations affect commerce ...." 42 U.S.C. § 2000a(b)(3). The Club is clearly a "place of entertainment." In *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), the Supreme Court held that a recreational facility offering swimming, boating, and miniature golf qualified as a place of entertainment under Title II. The Court reasoned that "entertainment" encompasses direct participation in a sport as well as the viewing of sports activities as a spectator. Under *Daniel's* reasoning, the Club is a place of entertainment because its members directly participate in a sport.

A place of entertainment affects commerce "if it customarily presents ... athletic teams, ... or other sources of entertainment which move in commerce ...." 42 U.S.C. § 2000a(c). Plaintiffs argue that the three golf tournaments held on the Club's premises bring it within this language. Defendants respond that the Club does not "present" the tournaments held once each year on behalf of Loudoun Memorial Hospital Golf and Tennis Classic, Inc. and the Special Olympics respectively because it merely donates its facilities to these groups.

The Court need not decide the validity of defendants' interpretation of the statute because even assuming that the Club does not "present" these two tournaments, it does annually present a tournament in which out-of-state professionals and club members play. In *Evans v. Laurel Links, Inc.*, 261 F.Supp. 474, 477 (E.D.Va.1966), the court held that a Virginia golf course "customarily present[ed]" "athletic teams which move[d] in commerce" where a golf team from the District of Columbia played on the course once a year. The Court finds *Evans* indistinguishable from the case at bar.[3]

The Court accordingly holds that the Club is a place of public accommodation within the purview of Title II.[4]

### III.   Private Club Exemption

The defendants contend that even if the Club is a place of public accommodation within §§ 2000a(a), (b)(3), it is exempt as a "private club ... not in fact open to the public" under § 2000a(e). Defendants bear the burden of proving that the Club qualifies for the exemption. *E.g., Nesmith v. YMCA*, 397 F.2d 96 (4th Cir.1968).

In determining whether an establishment is a truly private club, courts have examined a variety of factors, including whether the club is truly selective about its members, whether the club made insubstantial changes in its prior operation to avoid the impact of civil rights laws, whether the

---

**3.** Defendants attempt to distinguish *Evans* in two ways. First, they argue that, unlike *Evans,* the tournament here does not involve out-of-state "teams." They seem to argue that a foursome consisting of two of the Club's members and an out-of-state professional and club member does not constitute an "athletic team." Yet even accepting arguendo defendants' narrow reading of the phrase "athletic team," the out-of-state professionals and club members qualify as "other sources of entertainment which move in commerce." *See Daniel v. Paul, supra* (defining "entertainment" broadly). *Evans,* moreover, provides no support for defendants' crabbed reading of the phrase "athletic team."

Second, defendants assert that *Evans* is distinguishable because there the golf club neither argued that it was a private club nor alleged that its activities were entitled to First Amendment protection. The issues of whether the Club is exempt as a private club and, relatedly,

whether it has a colorable freedom of association defense are distinct from the issue here, that is, whether the Club is covered by the Act in the first instance.

**4.** The Court notes an alternative ground on which the Club might be held to affect commerce. One court has held that § 2000a(c)'s enumerated tests of whether an establishment affects commerce are not exclusive. *Adams v. Fazzio Real Estate Co.*, 268 F.Supp. 630 (E.D.La. 1967), *aff'd,* 396 F.2d 146 (5th Cir.1968). In other contexts, courts have expansively interpreted the phrase "affects commerce." *See generally* W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law § 3, II (5th ed. 1980). The Club, for instance, might affect commerce by purchasing food equipment or services from out of state or by selling memberships to persons from other states.

club operates for profit, and whether the club is owned and controlled by members. *See, e.g., Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969); *Nesmith, supra.* The key factor is whether the club's membership is truly selective. *See, e.g., Wright v. Salisbury Club, Ltd.,* 632 F.2d 309 (4th Cir.1980); *U.S. v. Eagles,* 472 F.Supp. 1174 (E.D.Wis.1979); *Cornelius v. Elks,* 382 F.Supp. 1182, 1203 (D.Conn.1974). Relevant here are the size of the club's membership fee, whether and how many white applicants have been denied membership relative to the total number of white applicants, *see Tillman v. Wheaton-Haven Recreation Association, Inc.,* 410 U.S. 431, 438 n. 9, 93 S.Ct. 1090, 1094 n. 9, 35 L.Ed.2d 403 (1973); *Wright,* 632 F.2d at 312; *Eagles,* 472 F.Supp. at 1176, whether the club advertises its memberships, *Wright,* 632 F.2d at 312–13, and whether the club has well-defined membership policies, *Nesmith,* 397 F.2d at 107. That the Club here has a substantial admission fee, a membership ceiling, a requirement that two members sign applications, and a requirement that the Board approve membership application does not, without more, establish that the Club's membership is sufficiently selective. The cases have held clubs to be actually open to the public despite the existence of one or more of these formal admission requirements. *See Tillman, supra* (membership ceiling); *Wright, supra* (2 member sponsorship & board approval requirements); *Nesmith, supra* (substantial annual dues & membership committee); *Eagles, supra* (2 member sponsorship & board approval requirements, membership committee). The crucial inquiry is whether formal admission procedures operate in practice to make the Club's membership selective. *Nesmith, supra* at 101.

Defendants have failed to satisfy their burden of demonstrating that, as a matter of law, their admission procedures operate in practice to make the Club's membership selective. Despite the existence of formal admission procedures, defendants' submissions do not show the Club to have well-defined admission policies. The record reveals neither that the Club routinely investigates the background and character of its applicants nor that it measures applicant against any moral, religious, or social standards.[5] Most important, defendants have not provided any hard information concerning how many white applicants the Club has turned away. A.D. Bogle, the Club's secretary-treasurer, states in his reply affidavit that the board recently rejected four white applicants. The reasons for the rejections are unclear. John Rand, the Club manager, stated in his deposition that no applicant has been denied membership since he began his tenure in March 1982. If only four white applicants have been denied membership since the Club instituted its current admission procedures, the Club cannot fairly be described as truly selective about its members.

Defendants contend that the number of applicants rejected significantly understates the selectivity of the Club's membership because its membership procedures deter or prevent unsuitable applicants from seeking membership in the first place. Defendants, however, have not provided any evidentiary support for this allegation of pre-application selectivity.

In short, on the basis of the existing record the Court is unable to conclude that the practical effect of the Club's membership procedures is to create a truly selective membership and that the Club is therefore within the private club exemption.

## IV. Pendent Jurisdiction

■ In their complaint, plaintiffs allege that defendant James Bogle interfered with a contract between plaintiff Green and the Club and that defendants are liable for intentional infliction of emotional harm. Plaintiffs ask the Court to exercise pendent jurisdiction over these two state claims;

---

**5.** Although the Club has not advertised its memberships, *see Wright, supra* (Club not truly private because, *inter alia,* it advertised its memberships), the record leaves open the possibility that, given the size of the community, the Club's efforts to increase its membership by having members solicit nonmembers were the substantial equivalent of advertising.

defendants now move to dismiss the pendent state law claims.

Defendants seem to concede that the Court has the *power* to entertain plaintiffs' state claims under the standards enunciated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). They seem to argue that the Court should utilize its *discretion* to dismiss the state claims. Because plaintiffs seek money damages on their state claims and cannot obtain monetary relief under Title II, defendants maintain that the state claims will predominate.

The cases are somewhat conflicting. In *Holmes v. Elks Club, Inc.*, 389 F.Supp. 854 (M.D.Fla.1975), the plaintiff charged the defendant with racial discrimination in violation of § 1983. The Court refused to entertain a pendent state claim for intentional infliction of emotional distress for three reasons: (1) state law regarding this type of tort was unsettled, (2) the request for monetary damages under state law meant that the state claim might predominate, and (3) federal law does not favor money damages for discrimination in public accommodations. In *Hughes v. Marc's Big Boy*, 479 F.Supp. 834 (E.D.Wis.1979), also a civil rights case, the court rejected the Holmes court's second and third rationale and assumed pendent jurisdiction over a state defamation claim.

Like the court in *Hughes*, this Court concludes that although Title II does not itself provide for money damages, Title II does not reflect a policy of precluding or disfavoring money damages under state law. The plaintiffs' request for monetary relief, therefore, does not preclude this Court from assuming pendent jurisdiction over plaintiffs' state claims.

Efficiency, a concern mentioned in *Gibbs*, argues strongly in favor of adjudicating both state and federal claims in one proceeding. Both state and federal claims necessitate the testimony of the same witnesses and to some substantial extent involve overlapping facts. There is, moreover, no reason to splinter the case into duplicative state and federal proceedings. Defendants do not contend, for example, that Virginia law concerning plaintiff's claims is unsettled and that Virginia courts therefore should decide the state law issues.[6]

### V. Substantive Objections to State Claims

#### A. Interference with Contract

■ Plaintiff Green has sued James Bogle for intentional interference with contract, presumably on the theory that Green's contract with the Club places no restrictions on who he may invite as a guest and that Bogle interfered with this contract by refusing to allow Brown to play on the Club's course as Green's guest. As defendants point out, however, only a third-party to the contract can be held liable for intentional interference. As to the Club, Bogle was not a third-party; he was acting as the Club's agent.

The Court accordingly dismisses the intentional interference with contract claim, giving plaintiff leave to amend the complaint to state a claim for breach of contract.

#### B. Intentional Infliction of Emotional Distress

■ Under Virginia law, a suit for intentional infliction of emotional distress may be maintained if the wrongdoer's conduct

(1) is intentional or reckless;

(2) offends generally accepted standards of decency or morality;

(3) is causally connected with plaintiff's emotional distress; and

---

**6.** Defendant James Bogle also argues that the state claims against him must be dismissed. He asserts that because the plaintiffs have abandoned their § 1985(3) claim against him, no federal claims remain to which the state claims may attach. Defendant's argument assumes that plaintiffs' Title II claim does not apply to him. On its face, plaintiffs' complaint does not make clear whether the Title II claim is meant to apply to defendant Bogle individually as well as the Club. But at oral argument, counsel for plaintiffs stated that Bogle is an individual defendant on plaintiffs' Title II claim. Treating counsel's explanation as a motion to clarify the complaint, the Court grants the motion.

(4) caused emotional distress that was severe.

*Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974).

According to his deposition, James Bogle told plaintiff Brown that he could not play on the Club's course because it was against Club policy. The record does not preclude the inference that both Bogle and Brown understood that the Club's policy was one of excluding blacks. This Court declines to hold, as defendants seem to argue, that Bogle's conduct, conduct that runs contrary to policies firmly embedded in federal and Virginia law, *see, e.g.,* Va.Code §§ 2.1–376; 36–86 et seq., does not, as a matter of law, offend generally accepted standards of decency or morality. As to the remaining requirements of a cause of action, defendants have not carried their initial burden of showing the nonexistence of a material fact in dispute.

### VI. Conclusion

For the foregoing reasons, defendants' motions for dismissal and/or summary judgment are denied, except that plaintiff Green's interference with contract claim against defendant James Bogle is dismissed.