**Mark G.A. WELSH, a minor, and Elliott A. Welsh, his father and next friend, Plaintiffs,**

v.

**BOY SCOUTS OF AMERICA and Boy Scouts of America West Suburban Council # 147, Defendants.**

**No. 90 C 1671.**

United States District Court,
N.D. Illinois, E.D.

Aug. 9, 1990.

---

**1416**

Richard Grossman, Dannen, Crane, Heyman & Simon, Chicago, Ill., for plaintiffs.

George A. Davidson, Kevin M. Crotty, Hughes, Hubbard & Reed, New York City, Thomas D. Allen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Plaintiffs have been denied membership in the Boy Scouts on the sole ground that they are unwilling to profess a belief in a Supreme Being or God. In their attempt to gain membership in the Boy Scouts, they have brought this lawsuit pursuant to Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, which prohibits places of public accommodation from discriminating on the basis of certain criteria, including religion, which Congress has determined are inappropriate.[1]

This case is currently before the Court on defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of such a motion is to challenge the sufficiency of the complaint's factual assertions to state a legal claim for relief. Accordingly, for purposes of deciding the motion, the Court is required to assume that the factual allegations of the complaint are true. *Banner Industries v. Central States Pension Fund,* 875 F.2d 1285, 1287 (7th Cir.1989). Defendants argue that the Boy Scouts is beyond the scope of Title II, which applies only to places of public accommodations, and alternatively that application of Title II to the Boy Scouts would be unconstitutional. For the reasons described below, defendants' arguments are not sufficient to warrant dismissal at this preliminary stage of the proceedings, and their motion must therefore be denied.

The Court notes that defendants do not argue that lack of belief in God is a viewpoint which is not protected against religious discrimination. *See EEOC v. Townley Engineering & Mfg. Co.,* 859 F.2d 610, 614 n. 5 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989); *Young v. Southwestern Savings and Loan Ass'n,* 509 F.2d 140 (5th Cir. 1975).[2] Thus the issue in this case is not

---

1. Whether the Boy Scouts may exclude individuals who do not profess a belief in God is a highly emotional question. For this very reason, however, it is important to assess such a case in terms of reasoned legal principles. The emotional nature of the desire on the part of some to avoid association with those who are different may merely illustrate better than any statute or legal opinion ever can the extent to which certain types of discrimination have become ingrained in our culture. Furthermore, it is in just these types of cases, where the discrimination is so ingrained, that the effective utilization of civil rights laws is most important. Cases involving allegations of racial and gender-based discrimination, while now commonplace, rarely provoke the expressed defense that such discrimination is justified. In contrast, religious discrimination—including discrimination against those who do not believe in God—remains openly defended by some in a way that most of our society no longer tolerates with respect to other forms of discrimination. This is true even though the concerns underlying the prohibition of religious discrimination stem from the Bill of Rights itself. The United States of America was founded on the concept of tolerance for differing beliefs with respect to religion, and the survival of this concept was sufficiently important that it resulted in a constitutional amendment forbidding the government from establishing religion or interfering with the free exercise of religion.

2. *Cf. Wallace v. Jaffree,* 472 U.S. 38, 52–54, 105 S.Ct. 2479, 2487–88, 86 L.Ed.2d 29 (1985): "[T]he individual's freedom to choose his own creed is the counterpart of his right to refrain

whether individuals who do not believe in God are entitled to be treated under anti-discrimination laws the same as individuals who hold any other beliefs concerning religion, but rather whether the Boy Scouts is an organization which is entitled to discriminate among membership applicants on the basis of religion.

## II. FACTS

Plaintiff Mark Welsh is the seven-year-old child of plaintiff Elliott Welsh and Donna Arsenoff. He lives with his parents in Hinsdale, Illinois, where he attends first grade. Neither plaintiff is a member of any organized religion, nor does either of them "firmly believe in a Supreme Being (God)." (Complaint ¶ 3(b).)[3]

Defendant Boy Scouts of America ("BSA") is a voluntary, charitable membership organization chartered by Congress in 1916 pursuant to 36 U.S.C. §§ 21–29. The purposes of the organization, as stated by Congress, are:

> to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using

the methods which were in common use by Boy Scouts on June 15, 1916.

36 U.S.C. § 23.

BSA is a civic organization which promotes, *inter alia*, good citizenship, physical fitness and camping for boys seven years of age and older. It encourages or requires adult family members of minor applicants to join BSA as supervisors. On plaintiffs' information and belief, BSA has over 4,000,000 members nationwide. Defendant West Suburban Council Boy Scouts of America ("Council")[4] is a local chapter of BSA located in LaGrange, Illinois. (BSA and the Council shall be referred to collectively as the "Boy Scouts.")

The Tiger Cubs is a BSA program for boys who are seven years old or in the first grade. On or about September 11, 1989, at Anne Jeans Grade School, Mark Welsh was supplied with a flyer inviting students to join BSA Tiger Cub Scout Pack 56. The flyer stated that a recruitment meeting for the Tiger Cubs would take place on September 15, 1989 at the Palisades School in Burr Ridge, Illinois.[5]

Mark Welsh attended the September 15 meeting along with Elliott Welsh, intending to enroll in the Tiger Cubs. At the meeting, Elliott Welsh was given an application to fill out for himself and his son.[6] At that time, plaintiffs learned that application to

---

from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intolerance of the disbeliever and the uncertain."

**3.** Defendants refer to plaintiffs as atheists, but that label does not appear in plaintiffs' com-

plaint and may not be accurate. An "atheist" is "one who denies the existence of God," while an "agnostic" is "one who holds the view that any ultimate reality (as God) is unknown and probably unknowable." Webster's Ninth New Collegiate Dictionary (1983). *See also* 1 Encyclopedia of Philosophy (ed. P. Edwards, 1967) at 56 ("agnosticism is the view that we do not know whether there is a God or not"); *id.* at 175 (an "atheist ... maintains that there is no God ... [or] rejects belief in God"). Plaintiffs' complaint does not specifically characterize plaintiffs as adherents to either of these positions.

**4.** The Council is sued under the name "Boy Scouts of America, West Suburban Council # 147." Defendants represent that the organization's correct name is that set forth in the text.

**5.** The flyer is reproduced as Appendix A.

**6.** Portions of the application form are reproduced as Appendix B.

join BSA requires the applicant to "recognize an obligation to God" and to take an oath to do one's "duty to God." Elliott Welsh discussed these requirements with the scout leader in attendance, Tom Bannon, who informed him that an applicant would have to agree with the statements regarding God or be barred from participating in BSA.

Plaintiffs left the meeting without applying, but Elliott Welsh subsequently sent a completed application and fees to the Council. On the application, he noted that he could not subscribe to BSA's Declaration of Religious Principle and the other references to God. The application was returned to him on September 28, 1989, along with a letter from BSA official Richard Corwin, who explained that the application could not be accepted unless the applicants agreed with the Declaration of Religious Principle set forth on the application.

On October 7, 1989, Elliott Welsh wrote a letter to BSA headquarters in Irving, Texas, reaffirming his and his son's desire to join BSA and suggesting that BSA should not exclude applicants based on religion. On October 30, 1989, plaintiffs received a reply from Harold Sokolsky, Assistant to the Chief Scout Executive, stating that in order to participate in BSA, adult leaders must sign the Declaration of Religious Principle and youth members are required to acknowledge a duty to God.[7]

BSA has also issued a "Reaffirmation of the Position of the Boy Scouts of America on 'Duty to God' " ("Reaffirmation") which emphasizes the importance of belief in God to the Boy Scouts.[8] There is no indication in the record of the circumstances which surrounded publication of the Reaffirmation.

Plaintiffs brought this lawsuit on March 21, 1990, alleging that the exclusion from BSA of individuals who are unwilling to subscribe to BSA's religious principles violates Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.* As relief, plaintiffs seek an injunction prohibiting BSA from maintaining a policy of refusing to admit persons who do not believe in God and requiring the Council to admit Mark Welsh as a youth member and Elliott Welsh as an adult partner. Defendants have moved to dismiss the complaint, arguing that even assuming the facts alleged by plaintiffs, the Court must find that Title II does not apply to the Boy Scouts and, alternatively, that it would be unconstitutional to apply Title II to the Boy Scouts. The Court cannot accept either of these arguments without giving plaintiffs an opportunity to gather and present factual evidence.

## III. SCOPE OF TITLE II

### A. Place of Public Accommodation

42 U.S.C. § 2000a(a), the centerpiece of Title II of the Civil Rights Act of 1964, provides:

> (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

Defendants argue that the Boy Scouts is not a "place of public accommodation," and that the Boy Scouts is therefore not subject to the restrictions of Title II. The statute defines "place of public accommodation" as follows:

> Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

---

**7.** The letter stated in part:

Our membership requirements which were established at our inception in 1910 have been in effect since then, and we are determined to maintain our position. Adult leaders are required to sign our declaration of religious principle, and youth members must subscribe to the Cub Scout Promise or Boy Scout Oath which includes "duty to God."

While not intending to define what constitutes belief in God, we do reaffirm our religious principle. You have a valid point that we do not explain this qualification in our recruiting material and we are now studying ways to inform potential members of this fact.

**8.** The *Reaffirmation*, which is included as an exhibit to the complaint, is reproduced as Appendix C.

(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other *place of* exhibition or *entertainment*; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b) (emphasis added). Plaintiffs contend that the Boy Scouts is a "place of public accommodation" by virtue of § 2000a(b)(3) because it is a "place of entertainment." Defendants argue that the Boy Scouts is not a "place," is not an "accommodation," and does not provide "entertainment." Defendants also argue that Congress specifically excluded the Boy Scouts from the reach of Title II.

1. "Place"

▮ Initially, the Court addresses defendants' argument that the Boy Scouts cannot be a place of public accommodation because it is not a "place" but rather is a membership organization. Place, according to defendants, refers to a "physical facility." Boy Scout groups, on the other hand, can meet in a variety of places, and the groups are defined by membership rather than by a particular facility.

In support of this argument, defendants point out that the specific types of facilities identified in Title II all are centered around definite physical places of business. Defendants also rely on several cases which have found that state statutes which prohibit discrimination by a "place of public accommodation" do not apply to organizations which do not conduct business from a specific physical "place." *See United States Jaycees v. Massachusetts Commission Against Discrimination ("MCAD")*, 391 Mass. 594, 463 N.E.2d 1151 (1984); *United States Jaycees v. Richardet*, 666 P.2d 1008 (Alaska 1983); *United States Jaycees v. Bloomfield*, 434 A.2d 1379 (D.C. Ct.App.1981).[9]

Plaintiffs respond by emphasizing that Title II must be read broadly so as to effectuate its purpose of removing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307–08, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969).[10] Plaintiffs also cite cases which have interpreted state public accommodation statutes broadly to apply beyond specific physical facilities. *See United States Jaycees v. McClure*, 305 N.W.2d 764 (Minn.1981); *National Organization for Women v. Little League Baseball, Inc.*, 127 N.J.Super. 522, 318 A.2d 33 (1974), *aff'd mem.*, 67 N.J. 320, 338 A.2d 198 (1974).[11]

---

**9.** Defendants also cite *Schwenk v. Boy Scouts of America*, 275 Or. 327, 551 P.2d 465 (1976), which held that BSA was not a place of public accommodation under Oregon state law. However, the opinion in *Schwenk* did not focus on BSA's lack of a specific physical facility.

**10.** *See also Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342, 349 (5th Cir.1968): "We do not read [Title II] with narrowed eye but with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public.

That Title II of the Civil Rights Act is to be liberally construed and broadly read we find to be well established."

**11.** The state court cases cited by defendants all focus on specific textual considerations, and they all interpret state statutes which define "place of public accommodation" by reiterating the word "place." *See MCAD*, 463 N.E.2d at 1152 n. 1 (statute defines "place of public accommodation" as "includ[ing] any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public ..."); *Richardet*, 666 P.2d at 1009 n. 2

All of these state court cases interpret state public accommodations statutes rather than Title II. However, the Court finds the reasoning in the cases cited by plaintiffs to be persuasive. The word "place" in the phrase "place of public accommodation," as used in the federal and state statutes, is most naturally read to be intended not as restrictive but rather as a convenient term to apply to organizations which sell or provide goods or services to the public. As stated in *Little League*, "[t]he statutory noun 'place' (of public accommodation) is a term of convenience, not limitation. It is employed to reflect the fact that public accommodations are commonly provided at fixed 'places,' *e.g.*, hotels, restaurants, swimming pools, etc." 318 A.2d at 37.[12]

As the *Little League* court observed, an accommodation can have a moving situs and still be considered a "place," as exemplified by a train. 318 A.2d at 37. Even membership organizations provide their goods or services at "places," although those places may be mobile or shifting. Thus the Little League Baseball organization has a "place" which "is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played." *Id.* In the case of a more amorphous organization like the Jaycees, the "facility" is not only the headquarters but also "the sometimes door-to-door, company-to-company solicitation of members for the organization, and ... the oft-shifted sites at which the affiliated local chapters hold their meetings during part of which a sales approach is usually made to prospective members invited to the meeting for that purpose." *McClure*, 305 N.W.2d at 772. As the *McClure* court further noted, "A variety of enterprises that serve the public do not extend their goods and privileges from the same physical location (*e.g.*, electricians, locksmiths, learning-at-home courses), and often they do not own or lease the sites at which they offer their goods and privileges." *Id.*[13]

For this reason, it simply would not make sense to interpret Title II as applying only to a physical facility rather than to a business or organization, which of necessity inhabits physical facilities, whether they be fixed and unitary or shifting and multi-

---

(statute defines "place of public accommodation" as "a place which caters or offers its services, goods or facilities to the general public ..."); *Bloomfield*, 434 A.2d at 1381 (statute defines "place of public accommodation" as "all places included in the meaning of such terms as ... hotels ... restaurants ... barrooms," etc.).

In contrast, the statutes in the state cases cited by plaintiffs, as well as Title II, do not reiterate the word "place" when defining "place of public accommodation" but rather use arguably broader words such as "establishment" or "facility." ("Establishment" may refer not only to a "place of business or residence," but also, for example, to "a permanent civil or military organization," according to Webster's Ninth New Collegiate Dictionary (1983).) *See* 42 U.S.C. § 2000a(b) ("Each of the following establishments which serves the public is a place of public accommodation ..."); *McClure*, 305 N.W.2d at 766 (statute defines "place of public accommodation" as "a business ... facility of any kind ... whose goods ... [and] privileges ... are sold, or otherwise made available to the public"). *Cf. Little League, supra* (New Jersey statute, N.J.S.A. 10:1–5, does not use the term "place," but merely defines by example). *But see United States Jaycees v. Iowa Civil Rights Comm'n*, 427 N.W.2d 450 (Iowa 1988) (while conceding that majority of decisions are to contrary, holds that Jaycees are not place of public accommodation under Iowa statute which applies to "place[s]," "establishment[s]," and "facilit[ies]").

**12.** *Little League* was cited with apparent approval when the United States Supreme Court determined that application of Minnesota's public accommodations statute to the Jaycees (*see McClure, supra*) would not infringe upon members' rights of association. *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The Supreme Court stated: "In deciding that the Act reaches the Jaycees, the Minnesota Supreme Court used a number of specific and objective criteria—regarding the organization's size, selectivity, commercial nature, and use of public facilities—typically employed in determining the applicability of state and federal antidiscrimination statutes to the membership policies of allegedly private clubs. *See, e.g., Nesmith v. Young Men's Christian Ass'n*, 397 F.2d 96 (4th Cir.1968); *National Organization for Women v. Little League Baseball, Inc.*, 127 N.J.Super. 522, 318 A.2d 33, *aff'd mem.*, 67 N.J. 320, 338 A.2d 198 (1974)."

**13.** *Cf. Little League*, 318 A.2d at 38 ("we discern nothing in the statute or its underlying purposes to persuade us that what would otherwise be a place of public accommodation is any less so

ple.[14] Defendants assert that "A Tiger Club [sic: Cub] group meets where it will: a church basement, a private house, or a backyard may be a Tiger Cub group meeting on a transitory basis." (Mem. in Support at 11.) Defendants do not argue that a church basement, a house, or a backyard is not a "place." Furthermore, it would be impossible in practice to draw a distinction between "places," which defendants argue are covered by Title II, and "membership organizations," which defendants argue are not covered by Title II. Many establishments are membership organizations which center their activities around certain definable places. When exclusionary practices of such organizations have been challenged pursuant to Title II, courts generally have focused more on the membership practices of the organizations (in particular, the selectivity of the membership process) than on the characteristics of the physical facilities involved (such as openness to the public). *See, e.g., Durham v. Red Lake Fishing and Hunting Club, Inc.*, 666 F.Supp. 954 (W.D.Tex.1987); *People of State of New York v. Ocean Club, Inc.*, 602 F.Supp. 489 (E.D.N.Y.1984); *United States v. Slidell Youth Football Association*, 387 F.Supp. 474 (E.D.La.1974). In other words, the issue is generally framed in terms of the extent of public access to membership in the organization rather than the access of the public, as consumers, to the establishment's physical facilities.

Thus the distinction advocated by defendants would be arbitrary, unworkable in practice, and contrary to the statute's remedial purposes.[15] The Court finds no basis for excluding from Title II's reach organizations which do not operate a unitary, definite "place" of business but rather carry out their activities in a large number of temporary locations. Accordingly, the Court rejects defendants' argument that the Boy Scouts cannot, as a matter of law, be subject to the provisions of Title II because it is not a "place."

### 2. "Accommodation"

■ In order for an establishment to constitute a "place of public accommodation," it must fit within one of the categories described in 42 U.S.C. § 2000a(b). *See supra* at 1419. Plaintiffs contend that the Boy Scouts is a "place of entertainment" and thus fits within § 2000a(b)(3).

Defendants dispute this characterization, arguing that the function of the Boy Scouts is education rather than entertainment. Plaintiffs respond by emphasizing the language in the Boy Scouts flyers, which seek to attract new members by emphasizing that members "have fun." (*See* Appendix A.) Plaintiffs also point out that "places of entertainment" for purposes of Title II include establishments which provide participatory recreational activities as well as those which provide passive entertainment. *See Daniel, supra,*

... because it does not have exclusive use or possession of the site of its operations").

**14.** Further guidance may be found in California court decisions interpreting the Unruh Civil Rights Act, California's public accommodations statute. The Unruh Act originally applied to "places of public accommodation and recreation" and was later amended to apply to "all business establishments of every kind whatsoever." *See generally Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal.3d 72, 219 Cal.Rptr. 150, 153, 707 P.2d 212, 215 (1985). In *Curran v. Mount Diablo Council of the Boy Scouts of America*, 147 Cal.App.3d 712, 195 Cal.Rptr. 325 (1983), *appeal dismissed*, 468 U.S. 1205, 104 S.Ct. 3574, 82 L.Ed.2d 873 (1984), the court held that "business establishments" included the Boy Scouts, rejecting the argument that the statute applied only to commercial enterprises. *See also Isbister*, 219 Cal.Rptr. at 155, 707 P.2d at 217 (finding that Boys' Club—a membership organization which

centered around a physical facility—was a "place of public accommodation or amusement" and thus a "business establishment).

Also instructive is the opinion in *Kiwanis International v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3d Cir.1986), *cert. dismissed*, 483 U.S. 1050, 108 S.Ct. 362, 97 L.Ed.2d 812 (1987). Although the Third Circuit found that the service organization at issue was not a "place of public accommodation" under New Jersey law, it emphasized that it did not focus on "the spatial characteristics of 'place'" but rather on the extent to which the organization was open to the public. 806 F.2d at 474–75.

**15.** Furthermore, as discussed below (*see infra* at 1424–1425), Title II includes an exemption for "private clubs." Such an exemption would be meaningless if Title II did not apply to any membership organizations, or clubs, in the first place.

395 U.S. at 306–08, 89 S.Ct. at 1701–02; *Miller v. Amusement Enterprises, Inc.,* 394 F.2d 342, 350–51 (5th Cir.1968); *Brown v. Loudoun Golf & Country Club, Inc.,* 573 F.Supp. 399, 402 (E.D.Va.1983); *Slidell, supra,* 387 F.Supp. at 482.

In light of the Boy Scouts' own emphasis on recreational activities and having "fun," as emphasized in the Boy Scouts literature attached to the complaint, the Court cannot conclude as a matter of law that the Boy Scouts is not a "place of entertainment."

■ Defendants further argue that the Boy Scouts is not a "place of public accommodation" because a "role in a membership organization" is not an "accommodation." Defendants rely on Webster's Third New International Dictionary, which defines "accommodation" as "lodging, food, and services (as at a hotel) or seat, berth, or other space occupied together with services available (as on a train). . . ."

For reasons beyond the principle that "one of the surest indexes of a mature and developed jurisprudence [is] not to make a fortress out of the dictionary," *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), the Court finds that a role in a membership organization does constitute an "accommodation" for purposes of Title II. Even under the definition proffered by defendants, "accommodation" encompasses the provision of services, and roles in a membership organization provide members with certain privileges and services in exchange for the members' contributions of time, money or other support. To exclude membership organizations from Title II would leave open a facile and obvious method for an otherwise covered establishment to continue discrimination in avoidance of Title II's strictures—the establishment would need only to reconstitute itself as a membership organization and grant memberships only to members of a certain race, sex, creed, etc. Indeed, many establishments attempted to evade Title II through this very means, but the resulting case law makes it clear that Title II does apply to membership organizations. *See, e.g., Daniel, supra,* 395 U.S. at 302–08, 89 S.Ct. at 1699–1702 (recreational facility which instituted membership feature following passage of Civil Rights Act of 1964 was place of public accommodation); *Slidell Youth, supra,* 387 F.Supp. at 482–83 (athletic association which in 1972 dropped white-only requirement and instituted restrictive membership clause was place of public accommodation). *Cf. United States v. Lansdowne Swim Club,* 894 F.2d 83 (3d Cir.1990) (athletic membership club was place of public accommodation); *Durham, supra,* 666 F.Supp. at 959–60 (recreational membership club was place of public accommodation); *Ocean Club, supra,* 602 F.Supp. at 494–96 (membership club was place of public accommodation); *Brown, supra,* 573 F.Supp. 399 (E.D.Va.1983) (golf membership club was place of public accommodation).[16]

■ Defendants further argue that at least certain roles in the Boy Scouts, such as Cubmaster and Scoutmaster, are not open generally to the public but rather are open only to individuals who are good role models. Therefore, defendants contend, these specific roles cannot be "accommodations," and in turn no roles in the Boy Scouts can be "accommodations." This argument suffers from at least two flaws. First, the question of whether a service is open to the general public does not affect whether it is an "accommodation," but rather affects whether it is a "place of *public* accommodation" and whether it is a "private club" (*see infra* at 1424–1428). Second, the fact that some aspects of an organization may not be open to the gener-

---

16. Defendants also rely on *Schwenk v. Boy Scouts of America,* 275 Or. 327, 551 P.2d 465 (1976), which held that the Boy Scouts was not a place of public accommodation for purposes of the Oregon public accommodations statute. The Oregon statute in question, however, is narrower than Title II; its primary purpose is to prohibit discrimination only by "business and commercial enterprises." 551 P.2d at 468. It would not, for example, apply to the YMCA. *Id.* 551 P.2d at 469. Title II, in contrast, applies beyond businesses, and includes organizations like the YMCA. *See, e.g., Smith v. Young Men's Christian Ass'n,* 462 F.2d 634 (5th Cir.1972); *Stout v. Young Men's Christian Ass'n,* 404 F.2d 687 (5th Cir.1968); *Nesmith v. Young Men's Christian Ass'n,* 397 F.2d 96 (4th Cir.1968). Therefore, case law developed under the Oregon statute cannot be relied upon with respect to Title II.

al public does not remove the entire organization from the scope of Title II. In fact, the converse is true; if part of an establishment is covered by Title II, the entire establishment is subject to its provisions. *See Daniel, supra,* 395 U.S. at 305, 89 S.Ct. at 1701; *Lansdowne, supra,* 894 F.2d at 87.

The Court finds that defendants have not established, as a matter of law, that the Boy Scouts is not an "accommodation" for purposes of Title II.

3. Congressional Intent

■ Defendants also argue that Congress intended to exempt the Boy Scouts from the coverage of Title II. Central to this argument is the language of the 1916 act which chartered the Boy Scouts. That statute provided that a purpose of the Boy Scouts was to train boys "using the methods which were in common use by Boy Scouts on June 15, 1916." 36 U.S.C. § 23. Because the Boy Scouts had stated as early as 1911 that "no boy can grow into the best kind of citizenship without recognizing his obligation to God" (*see* Appendix C), defendants argue that Congress gave its stamp of approval to the Boy Scouts' exclusion of individuals who could not subscribe to its religious principles. To now interpret Title II as requiring the Boy Scouts to surrender this policy would, defendants maintain, be a finding that Title II implicitly repealed that portion of the 1916 charter which endorsed the methods practiced by the boy Scouts in 1916. Because implicit repeals are not favored, Title II should not be interpreted in this manner.

In support of this argument, defendants rely on *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In *Morton,* the Supreme Court found that the anti-discrimination provisions of the Equal Employment Act of 1972, 42 U.S.C. § 2000e

*et seq.,* did not override an employment preference created by the Indian Reorganization Act of 1934, 25 U.S.C. § 472, for Native Americans in the Bureau of Indian Affairs. The Court stated that "repeals by implication are not favored" and noted that the employment preference was "a specific provision applying to a very specific situation." 417 U.S. at 549–50, 94 S.Ct. at 2482–83. Accordingly, absent a clear intent to the contrary, the employment preference was not nullified by the more general anti-discrimination statute. 417 U.S. at 551, 94 S.Ct. at 2483.

The argument that Congress sanctioned the Boy Scouts' discriminatory policy is too attenuated to permit the extension of *Morton* to this case. The 1916 charter is not "a specific provision applying to a very specific situation" with respect to the Boy Scouts' exclusion of individuals who did not believe in God. There is no indication that in recognizing the purposes of the Boy Scouts as including the use of methods which were in use in 1916, Congress intended to adopt, or was even aware of, the Boy Scouts' policy concerning religion.[17] Congress was not creating a new organization; it was merely providing official recognition to an existing organization. As the *Little League* court noted in an analogous context:

[T]he purpose clause of the Little League charter does not signify a congressional policy decision that only boys should play baseball. The statute rather represents only a determination that Little League Baseball, Inc., such as it is, should have a national charter.... Moreover, the ascription of any purpose or policy beyond the mere grant of a federal charter would be incompatible with Congress' limited power to create corporations.

318 A.2d at 40.[18] Indeed, in light of the establishment clause of the First Amend-

---

**17.** As plaintiffs point out, although the 1911 *Handbook* emphasized the importance of recognizing an obligation to God as a prerequisite to good citizenship, there is no clear indication in the record that the 1911 *Handbook* provided for the exclusion from the Boy Scouts of individuals who did not profess a belief in God. Furthermore, even if such a membership policy existed—and was known by Congress—the vague language of the 1916 charter does not clearly demonstrate that an objective of Con-

gress was to perpetuate this policy. *Cf. Little League, supra,* 318 A.2d at 39–40 (the Little League charter and its statutory history "do show that Congress *contemplated* participation only by boys; however, they do not show that a limitation exclusively to boys was an avowed congressional objective").

**18.** The *Little League* court also expressed a belief that "the charter is itself a tenuous exercise of federal power." 318 A.2d at 40 n. 4. The

ment, it is questionable whether Congress would have the power to charter an organization officially entitled to discriminate on the basis of religion. Furthermore, without any indication in the language of the 1916 statute that Congress intended to permit the Boy Scouts to discriminate on the basis of religion, it is extremely unlikely that Congress, in subsequently enacting Title II, would have been conscious of the alleged statutory authorization for the Boy Scouts' policy and thus would have considered whether to override it.

The Boy Scouts unsuccessfully made a similar argument in *Curran, supra,* in which the court found that California's Unruh Act prohibited the Boy Scouts from excluding homosexual men. The Court held that the language of the charter did not sanction such discrimination and emphasized that in granting the charter Congress gave the Boy Scouts the power to "make and adopt by-laws, rules and regulations not inconsistent with the laws of the United States, or any State thereof...." 195 Cal.Rptr. at 339, citing 36 U.S.C. § 22. Similarly, in *Little League,* the court stated: "The New Jersey statute as applied does not vitiate the charter of incorporation; it merely regulates how Little League shall conduct its activities in the State of New Jersey in respect to exclusion of participants on the basis of sex. In this regard it may be noted that the charter's

objects are required to be pursued 'in all lawful ways.'" 318 A.2d at 41.

The Court concludes that the 1916 charter does not provide statutory authorization for the Boy Scouts to discriminate on the basis of religious belief, and that even assuming such an authorization can be inferred, it does not survive the enactment of Title II.[19]

### B. Private Club

Title II explicitly excludes "private clubs" from coverage as places of public accommodation:

> The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section.

42 U.S.C. § 2000a(e). Defendants argue that the Boy Scouts is a private club and is thus exempt from the provisions of Title II.[20]

■ In determining whether an organization is a private club for purposes of Title II, courts have weighed a number of factors. In *United States v. Lansdowne Swim Club,* 713 F.Supp. 785 (E.D.Pa.1989), *aff'd,* 894 F.2d 83 (3d Cir.1990), the court

---

parties in this case have not discussed whether the Boy Scouts charter was a legitimate exercise of federal power, and that issue need not be resolved to decide the pending motion.

19. Defendants also rely on certain cases in which public accommodation statutes have not been applied to organizations with religion-based membership criteria. However, those cases did not hold that *all* organizations may exclude individuals on the basis of their religious beliefs; such a holding would conflict with Title II's express inclusion of "religion" as an impermissible basis for discrimination. Rather, they relied on factual evidence concerning such factors as the selectivity of the organizations to find that the organizations were not places of public accommodation. Thus in *Kiwanis,* the local organization had added as a membership requirement that a candidate be willing to pray and recite the pledge of allegiance. 806 F.2d at 475. The Court did not emphasize this requirement in holding that the organization was not a place of public accommodation, but rather stressed that the organiza-

tion's membership criteria and practices as a whole did not pass the test of "unselectivity, unrestrictedness, and open invitation." 806 F.2d at 476. *See also Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182, 1203 (D.Conn.1974) (Elks organization was private club); *Kiwanis Club of Great Neck, Inc. v. Board of Trustees of Kiwanis,* 41 N.Y.2d 1034, 363 N.E.2d 1378, 395 N.Y.S.2d 633 (1977), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977). These cases involved organizations with more stringent membership criteria than those which appear, from the current record, to apply to the Boy Scouts.

20. Defendants argue that the Boy Scouts are excluded from Title II by an "express exemption." (Mem. in Support at 9.) In support of this argument, defendants refer only to the "private club" exclusion, the application of which concerns questions of fact. This hardly constitutes an "express exemption."

reviewed the case law and summarized the relevant factors as follows:

1. The genuine selectivity of the group in the admission of its members.

2. The membership's control over the operations of the establishment.

3. The history of the organization.

4. The use of the facilities by non-members.

5. The purpose of the club's existence.

6. Whether the club advertises for members.

7. Whether the club is profit or non-profit.

8. The formalities observed by the club, e.g., bylaws, meetings, membership cards.

713 F.Supp. at 796–97, citing *Tillman v. Wheaton–Haven Recreation Ass'n,* 410 U.S. 431, 438, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973); *Wright v. Salisbury Club, Ltd.,* 632 F.2d 309, 312–13 (4th Cir. 1980); *Nesmith v. YMCA,* 397 F.2d 96, 102 (4th Cir.1968); *Durham v. Red Lake Fishing & Hunting Club,* 666 F.Supp. 954, 960 (W.D.Tex.1987); *Brown v. Loudoun Golf & Country Club, Inc.,* 573 F.Supp. 399, 402–03 (E.D.Va.1983); *United States v. Trustees of Fraternal Order of Eagles,* 472 F.Supp. 1174, 1175–76 (E.D.Wis.1979); *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182, 1203 (D.Conn. 1974); *Wright v. Cork Club,* 315 F.Supp. 1143, 1152 (S.D.Tex.1970); *United States v. Jordan,* 302 F.Supp. 370, 375–76 (E.D.La. 1969). The most significant of these factors—as evidenced by the language of the statute itself and by the importance given to it in the case law—is the selectivity of the organization in admitting new members. *See Brown,* 573 F.Supp. at 403; *Fraternal Order of Eagles,* 472 F.Supp. at 1175.

■ The burden is on defendants to prove that the Boy Scouts is a private club. *Lansdowne,* 894 F.2d at 85. As is evident from the types of factors that are relevant to the analysis, determining whether an organization is a private club generally requires a detailed factual analysis of the organization's structure and policies. Thus to prevail on their motion to dismiss, defen-dants have the difficult task of showing that under no set of facts consistent with the allegations of the complaint could the Boy Scouts be found to be other than a private club. In the instant case, defendants have not succeeded at this task.

■ With respect to selectivity of membership, plaintiffs allege that the Boy Scouts is open to all members of the public who subscribe to the Boy Scouts' religious principles. Plaintiffs emphasize that the literature distributed by the Boy Scouts appears to extend an open invitation to all boys and their adult relatives. One flyer states, for example, "You can join Tiger Cubs, BSA if you are in the first grade." (*See* Appendix A.) The flyer further states:

Q. Who can be a Tiger Cub?

A. Any boy who is in the first grade (or is 7 years old) may join Tiger Cubs, BSA, with his adult partner.

Q. Who can be an adult partner?

A. Any adult 18 years of age or older can work with the boy in Tiger Cubs, BSA. This can be mom, dad, an aunt, uncle or grandparent, an older brother or sister, or even a neighbor.

(*See* Appendix A.)

The Court also notes that there is no evidence in the record of any standards—other than the Declaration of Religious Principle—that the Boy Scouts use to screen membership applications. The lack of such standards is a significant factor weighing against a finding that an organization is a private club. *See, e.g., Lansdowne,* 894 F.2d at 86 (organization was not public accommodation where it had no substantial membership standards, even though applicants were subject to approval by vote of existing members). Furthermore, there is no indication in the record that the Boy Scouts has ever refused membership to an individual who was willing to subscribe to the Declaration of Religious Principle. *Cf. Wright,* 632 F.2d at 312 (club which had only turned down three white applicants for membership was not selective and was not private club); *Durham,* 666 F.Supp. at 960 (club which had only turned down two white applicants for membership was not selective and was not

private club). The degree of selectivity exercised by the Boy Scouts is comparable to that of the organization at issue in *Slidell, supra:*

> Over 2,000 applications by whites have been made since 1969 and all of them have been accepted. No interview is conducted, no recommendation is required, no evaluation of the youth is made, no discussion of the benefits the youth offers to SYFA occurs. In short, an application from a white youth is automatically accepted if he tenders the requisite fee, a waiver of liability signed by his parents, and is of a certain age and weight. These criteria reflect a total lack of genuine selectivity.

387 F.Supp. at 485. Similarly, there is no allegation here that the Boy Scouts conducts an interview, requires a recommendation, or evaluates the benefits a youth will offer before accepting the application of a youth who professes a belief in God.

The fact that the Boy Scouts exercises some selectivity by requiring members to sign the Declaration of Religious Principle does not in itself show that the organization is a private club. This is illustrated by *Daniel, supra,* in which the Supreme Court found that a recreation club was not private even though it exercised some selectivity by excluding black persons from membership. 395 U.S. at 302, 89 S.Ct. at 1699. The Court emphasized the district court's finding of fact that the club was "open in general to all of the public who are members of the white race." *Id. See also Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 438, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973) (organization was not private club where it was "open to every white person within the geographic area, there being no selective element other than race"); *Durham, supra,* 666 F.Supp. at 959 ("a 'truly private club' ... does have the right to discriminate against potential members based on race; but clearly the *only* criteria for selection cannot be that one be white). Similarly, on the present record, it appears that the Boy Scouts is open to all boys who profess a belief in God.

Another instructive example is *Fraternal Order of Eagles, supra,* in which the defendants moved to dismiss a Title II lawsuit on the basis that the organization was a private club. The court noted that the organization had formal membership requirements which included the following:

> (1) "[e]very applicant for membership in any Local Aerie shall be recommended by two members of the Order"; (2) "[n]o person shall be eligible to be elected to membership in any Local Aerie unless such person is a male, *is of good moral character, and believes in the existence of a Supreme Being, ...*"; (3) "[n]o application for membership shall be considered if the applicant shall not reside within the jurisdiction of the Aerie to which such application is submitted"; (4) "[e]ach person desiring to become a member of an Aerie must properly fill out and sign an application ..."; (5) "[a]ll applications for membership ... shall be referred to the Investigating Committee"; and (6) "[a]fter the report of the Investigating Committee is submitted, the application shall be voted upon...."

472 F.Supp. at 1176 (emphasis added). The court found that despite these formal membership requirements, which are more stringent than those which appear from the present record in this case, the organization had not established that it was a private club as a matter of law. 472 F.Supp. at 1177. *See also Curran, supra,* 195 Cal.Rptr. at 336–37 (Boy Scouts not a private club exempt from California's Unruh Act). Thus exclusion of individuals on the basis of religion does not in itself make an organization a private club.

Furthermore, the requirement that members believe in God is scarcely a restrictive criterion. There are countless individual interpretations of what "God" is or what it means to "believe in God." *Cf.* H.P. Owen, "God, Concepts of," 3 Encyclopedia of Philosophy at 344 ("It is very difficult—perhaps impossible—to give a definition of God that will cover all usages of the word and of equivalent words in other languages."). The Boy Scouts chooses not to address this dilemma: "It is not the role of the Boy Scouts of America to give theological interpretations. Religion is the respon-

sibility of the Scout's family and religious leaders." (Appendix C.) Based on the Boy Scouts' emphasis on its nonsectarian attitude (see also Declaration of Religious Principle, Appendix B), it apparently makes no difference to the Boy Scouts whether one believes that God is male, female, or neither; whether one believes that God consists of three entities or one; or whether one believes that God exists apart from the natural world or is synonymous with it. The Boy Scouts apparently believes, for instance, that Protestant members are willing to participate alongside of Catholics, Jews, Buddhists, Hindus, Unitarians, Deists, Hare Krishnas, and adherents to all religions known to humankind, but not atheists or agnostics. Indeed, the concept of "God" is sufficiently vague that it is difficult to understand how the Boy Scouts can actually use, in practice, belief in God as a criterion for membership.[21]

Thus consideration of the most important factor in the private club analysis—selectivity of membership—does not, at this stage, support defendants' position that the Boy Scouts is a private club. Although there is some meager evidence in the current record concerning the other relevant factors (*supra* at 23), the Court will not analyze those factors individually at this stage. Defendants do not argue that an application of those factors mandates a finding that the Boy Scouts is a private club, and in light of the factual nature of the inquiry and the literature quoted by plaintiffs such an argument would not have a realistic chance of succeeding in the context of a motion to dismiss. Rather, defendants emphasize the legislative history, which they maintain demonstrates that Congress intended to include the Boy Scouts in the concept of private club.

In support of this argument, defendants cite a passage from the floor debate concerning Title V of the Civil Rights Act of 1964. Representative George Meader was asked whether an exemption for private clubs from Title V's provisions concerning the Civil Rights Commission's authority to collect and distribute information[22] would cover "such organizations as the Boy Scouts of America, the Girl Scouts, the Future Farmers of America, the 4–H Clubs—that type of organization." Representative Meader replied, "That would be covered by the term 'private club' like the Kiwanis Club, the Lions Club, and so forth." 110 Cong.Rec. 2296 (Feb. 6, 1964).[23] From Representative

---

**21.** The requirement that applicants affirm their belief in God in order that they "can grow into the best kind of citizen (Declaration of Religious Principle, Appendix B) is similar to the requirement in *Brown, supra,* that an individual have "good moral character." 573 F.Supp. at 400. *Brown* involved further membership requirements which were more stringent than those of the Boy Scouts, including the payment of a $750.00 initiation fee, the signature of two members on the application form, and approval of the application by the board of directors. *Id.* There was also a ceiling of 450 members. *Id.* The court found that the organization's membership requirements were not selective, and that it was therefore not a private club. *Id.* at 403.

**22.** *See* 42 U.S.C. § 1975c(b): "Nothing in this chapter or any other Act shall be construed as authorizing the Commission, its Advisory Committees, or any person under its supervision or control to inquire into or investigate any membership practices or internal operations of any fraternal organization, any college or university fraternity or sorority, any private club or any religious organization."

**23.** In context, the passage reads as follows:

Mr. [George] Grant.... Mr. Chairman, I want merely to ask the author of this substitute amendment to be sure that this does include fraternities and sororities, and that is exactly why this amendment is here today. Regardless of what the gentleman from Illinois said, the amendment offered by the gentleman from Louisiana did include fraternities and sororities, and that is why I supported it. This Commission has no more base for planting these young boys and girls on the campuses of these universities, public or private, in America, than they would have on a church which was situated on the campus of the university. So I would like to ask the gentleman from Michigan [Mr. Meader] if this does cover college fraternities and college sororities.

Mr. Meader. Of course it does, but if the gentleman wants to pin that down, why not ask unanimous consent that that amendment be rereported, and everybody will hear it.

Mr. Grant. I understand it does. I certainly take the gentleman's word for it.

Mr. [John] Williams. Mr. Chairman, will the gentleman yield?

Mr. Grant. I yield to the gentleman from Mississippi.

Meader's comment about Title V, defendants infer that Congress as a whole intended to include the Boy Scouts in the "private club" clause of Title II.

The Court cannot agree. Although statements of individual legislators may have some relevance to statutory interpretation, they are by no means controlling. *See Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *United States v. O'Brien,* 391 U.S. 367, 383–85, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien,* 391 U.S. at 384, 88 S.Ct. at 1683. Here, the passage cited by defendants is simply too isolated and indirect to constitute an "express exemption" for the Boy Scouts from Title II's requirements. Particularly in light of the fact that the factors identified by the Title II precedents appear at this stage of the case to exclude, rather than include, the Boy Scouts from the private club exemption, the Court is unwilling to rely on Representative Meader's remark to hold that the Boy Scouts is exempt from Title II as a matter of law.

## C. Conclusion

If the Boy Scouts were not a place of public accommodation, or if it were a private club, Title II would not only not prevent the Boy Scouts from excluding individuals who do not believe in God, it would

also not prevent the Boy Scouts from engaging in other forms of discrimination as well. For instance, the Boy Scouts could exclude members of a racial minority or members of a particular sect of Christianity. Under such circumstances, the case would essentially be unchanged. If the visceral reaction would be different, it would serve only to demonstrate the persistence and depth of discrimination against atheists. *See infra* at 1433–1434. To argue that Title II does not prohibit the Boy Scouts from discriminating against atheists is to argue that Title II does not prohibit any type of discrimination by the Boy Scouts. As the Court has described above, defendants have not shown that the Boy Scouts are not subject to Title II. Further, if there is a principle which specifically allows the Boy Scouts to discriminate against individuals who do not believe in God, it must be that individuals who believe in God should not be required to associate with individuals who do not. That issue concerns not the scope of Title II, but the scope of the First Amendment. It is to the constitutional issues which are thus raised that the Court now turns.

## IV. FREEDOM OF ASSOCIATION AND FREE EXERCISE

Defendants argue that application of Title II to the Boy Scouts would infringe on members' freedom to associate, which is guaranteed by the First Amendment to the United States Constitution.[24] There are two types of freedom of association which have been afforded constitutional protection—freedom of intimate association and freedom of expressive association. *See Board of Directors of Rotary International v. Rotary Club of Duarte,* 481 U.S. 537,

Mr. Williams. I think it also might be well to inquire of the gentleman from Michigan if under the language of his amendment the Commission is prohibited from meddling in the affairs of such organizations as the Boy Scouts of America, the Girl Scouts, the Future Farmers of America, the 4–H Clubs—that type of organization.

Mr. Meader. That would be covered under the term "private club," like the Kiwanis Club, the Lions Club, and so forth.

**24.** The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;

or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Defendants do not argue that Title II is unconstitutional on its face; such a claim would be unlikely to succeed in light of *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 108 S.Ct. 2225, 2233–35, 101 L.Ed.2d 1 (rejecting facial attack to New York's public accommodation statute). *See also Roberts,* 468 U.S. at 629–31, 104 S.Ct. at 3256–57 (rejecting argument that Minnesota's public accommodation statute was vague and overbroad).

107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) (application of California's Unruh Act to Rotary Clubs does not violate First Amendment); *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984) (application of Minnesota's Human Rights Act to Jaycees does not violate First Amendment). Defendants argue that application of Title II to the Boy Scouts would infringe on both of these interests. Defendants also argue that such application would violate their First Amendment right to freely exercise their religion.

*A. Intimate Association*

■ The Supreme Court has recognized that the Bill of Rights, in order to "secure individual liberty," must afford protection from unjustified governmental interference to "certain kinds of highly personal relationships." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3250. Most obvious among those relationships are those that involve family bonds, such as marriage, procreation, education, and cohabitation with relatives. *Rotary International*, 481 U.S. at 545, 107 S.Ct. at 1945–46; *Roberts*, 468 U.S. at 619, 104 S.Ct. at 3250. This is because "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts*, 468 U.S. at 619–20, 104 S.Ct. at 3250.

Although freedom of intimate association may extend beyond family relationships, it generally includes only relationships which, like family relationships, "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620, 104 S.Ct. at 3250. In determining the protection provided to a particular type of association, the Court must assess "where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* at 620, 104 S.Ct. at 3251. *See also Rotary International*, 481 U.S. at 546, 107 S.Ct. at 1946. Factors which are relevant to this assessment include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Roberts*, 468 U.S. at 620, 104 S.Ct. at 3251. *See also Rotary International*, 481 U.S. at 546, 107 S.Ct. at 1946.

In arguing that membership in the Boy Scouts is a form of intimate association protected by the Constitution, defendants contend that such membership involves the education of children. Defendants point out that in *Roberts*, the Court cited, as examples of cases recognizing that "highly personal relationships" must be protected from unjustified governmental interference, the cases of *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), in which the Court held that compulsory attendance at public schools interfered with the liberty to upbring and educate one's children, and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), in which the Court invalidated a statute making it illegal to teach a foreign language to any child who had not yet completed the eighth grade. However, in noting that intimate association includes relationships which attend the "raising and education of children," *Roberts*, 468 U.S. at 619, 104 S.Ct. at 3250, the Supreme Court did not say that every form of association which in some way involves education is protected from all governmental intrusion.[25] The *Roberts* opinion must be read as a whole, and its emphasis on standards such as the

---

**25.** Thus, in *Runyon v. McCrary*, 427 U.S. 160, 175–76, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976), the Court held that application of 42 U.S.C. § 1981 to prohibit private, commercially operated, nonsectarian schools from excluding students on the basis of race did not violate rights of free association. The Court stated: "[I]t may be assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions. But it does not follow that the *practice* of excluding racial minorities from such institutions is also protected by the same principle.... '[T]he Constitution ... places no value on discrimination.'" 427 U.S. at 176, 96 S.Ct. at 2597 (emphasis in original; citations omitted).

size, purpose and selectivity of relationships cannot be ignored.

This is not a case where the government has directly impinged on the interests of parents or guardians to educate their children. Title II, as plaintiffs wish to apply it, does not affect the children's schooling, and to the extent that the Boy Scouts may have an educational function in addition to traditional schooling, Title II does not forbid a parent from ensuring that a child is exposed to that function. Title II would merely require that to the extent the Boy Scouts educates children, it do so without excluding certain children on the basis of criteria which Congress has determined to be improper.

In arguing that Title II infringes on rights to intimate association, defendants do not even discuss the specific factors recognized by the Supreme Court as governing the determination of whether a particular relationship constitutes intimate association. Plaintiffs, on the other hand, argue that an examination of those factors precludes any finding that the Boy Scouts involve intimate association. As alleged in the complaint, the Boy Scouts has over 4,000,000 members in the United States. Furthermore, as evidenced by the Boy Scouts literature attached to the complaint, the Boy Scouts is not selective in its admission of new members. (*See supra* at 1425–1427.) Assuming the truth of the complaint's allegations, the Boy Scouts is thus very similar in structure to other groups which have been held not to involve intimate association. *See Rotary International*, 481 U.S. at 547, 107 S.Ct. at 1947; *Roberts*, 468 U.S. at 620–21, 104 S.Ct. at 3251 (Jaycees); *Curran, supra*, 195 Cal. Rptr. at 336–37 (Boy Scouts). Accordingly, the Court cannot find as a matter of law that the Boy Scouts involves relationships of such a highly personal nature that application of Title II would violate members' rights of intimate association.

## B. *Expressive Association*

1. Engagement in Expressive Association

■ The right to associate for expressive purposes stems from an "individual's freedom to speak, to worship, and to petition the government for the redress of grievances[, which] could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252. In *Roberts*, the Court held that membership in the Jaycees involves rights of expressive association, based on the Jaycees' substantial activities which constitute "protected expression on political, economic, cultural, and social affairs." 468 U.S. at 626, 104 S.Ct. at 3254. These activities include the "tak[ing] of public positions on a number of diverse issues, ... [and] engage[ment] in a variety of civic, charitable, lobbying, fund-raising, and other activities worthy of constitutional protection under the First Amendment." *Id.* See also 468 U.S. at 622, 104 S.Ct. at 3252.

Defendants argue that application of Title II to the Boy Scouts "not only would ... require a change in the Boy Scouts' creed that 'no member can grow into the best kind of citizen without recognizing an obligation to God' ..., it would restrict Boy Scouts' ability to 'exclude individuals with ideologies or philosophies different from those of existing members.'" (Reply Mem. at 8–9.)

This argument begs the question. Clearly application of Title II restricts the ability of a place of public accommodation to exclude individuals with different religious philosophies, just as it restricts the ability to exclude individuals on other grounds, such as race. However, while "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, ... it has never been accorded affirmative constitutional protections." *Norwood v. Harrison*, 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973). By its very terms, Title II always operates to prevent exclusion of people who are different. The more fundamental question is whether the particular organization engages in expressive activity which would be unduly infringed by application of Title II.

Defendants do not call the Court's attention to specific expressive activities which the Boy Scouts conducts—and indeed, consideration of such activities would be of dubious merit in the context of a motion to dismiss.[26] Furthermore, the Boy Scouts' own literature states that "partisan political activities are prohibited." (Appendix B.) To support the assertion that the Boy Scouts involves expressive association, defendants merely argue:

> The Boy Scout movement is designed and intended to transmit moral, spiritual, and cultural values. One of the purposes of the Scouting program is to help boys become honorable men. The members of Boy Scouts believe that this objective is best accomplished when a boy is taught to believe in God and to acknowledge a duty owed to a Supreme Being.
>
> ... Teaching boys to become men by insisting on recognition of a duty to God is expressive association "intended to develop good morals, reverence, patriotism, and a desire for self-improvement."

(Mem. in Support at 15.) Defendants appear to argue that because the Boy Scouts is bound by a common belief, it follows as a matter of law that it engages in expressive association. A whites-only athletic club might similarly argue that its members are engaged in expressive association merely because they are bound by a common belief that whites are better than blacks. Without more than such a common belief, the Court cannot find, as a matter of law, that an organization engages in expressive association.[27] Whether an organization engages in expressive association is a question of fact, and questions of fact are not appropriately considered in connection with a motion to dismiss. Further, even if the Court were able to engage in a factual inquiry at this stage, defendants have set forth no facts which could lead to a finding that the Boy Scouts engages in expressive activity.

### 2. Unjust Infringement of Right to Expressive Association

■ Even were it to assume that the Boy Scouts engages in expressive association, the Court would next need to inquire whether the Boy Scouts' freedom to engage in that expressive association is unjustly infringed by application of Title II. "The right to associate for expressive purposes is not ... absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623, 104 S.Ct. at 3252. The Court in *Roberts* approached this analysis by balancing the extent of the infringement against the importance of the governmental interest at stake. 468 U.S. at 623–29, 104 S.Ct. at 3253–55.

In this case, it is not clear how Title II infringes on any expressive association in which the Boy Scouts may engage. Although the record does not indicate what those expressive activities may be, it does appear that they would not relate to religion. The Tiger Cubs membership application makes it clear that religious expression is not central to the Boy Scouts' activities:

> The Boy Scouts of America recognizes the importance of religious faith and duty; it leaves religious instruction to the member's religious leaders and family. Members who do not belong to a unit's religious chartered organization

---

**26.** In light of the Boy Scouts' apparent tolerance for an innumerable variety of religious beliefs (*see supra* at 1426–1427), it is difficult to understand how the organization could—even if it so desired—present a unified expression on positions concerning religion.

**27.** Defendants also rely on Justice O'Connor's concurrence in *Roberts:* "Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement." 468 U.S. at 636, 104 S.Ct. at 3259–60, citing, *inter alia*, W. Hillcourt, The Official Boy Scout Handbook (1979); P. Fussell, The Boy Scout Handbook and Other Observations 7–8 (1982). It is quite a leap from this dictum, in which Justice O'Connor (who did not join in the majority's discussion of expressive association) indicates that some scouting activities "might" become expressive, to a conclusion that as a matter of law the Boy Scouts engage in expressive association. The Court declines defendants' invitation to make that leap.

shall not be required to participate in its religious activities.

(Appendix B.) Similarly, the Declaration of Religious Principle provides:

> The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God and, therefore, recognizes the religious element in the training of the member, but it is absolutely nonsectarian in its attitude toward that religious training. Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life.

(Appendix B.) It thus appears that the Boy Scouts does not engage in overtly religious activities or expression, and accordingly that requiring the Boy Scouts to admit individuals who do not believe in God would not require the organization to alter any of its activities. Again, resolution of this issue is a question of fact, but even if the Court could resolve questions of fact to decide the motion to dismiss, it could find no basis, on the present record, for concluding that acceptance by the Boy Scouts of members who do not believe in God would have any effect on expressive activity—just as in *Roberts* there was no basis for concluding "that admission of women as full voting members will impede the organization's ability to engage in ... protected activities or to disseminate its preferred views." 468 U.S. at 627, 104 S.Ct. at 3254.[28]

Perhaps the Boy Scouts believe that its ability to express its views on non-religious matters would be affected by admission as members of individuals who do not believe in God because such individuals may have a different agenda than that of those who do believe in God. Such an argument, although theoretically plausible, would be an uphill battle. As the Court stated in *Roberts*, where it found no support for such an argument in the record:

> In claiming that women might have a different attitude about such issues as the federal budget, school prayer, voting rights, and foreign relations, or that the organization's public positions would have a different effect if the group were not "a purely young men's association," the Jaycees relies solely on unsupported generalizations about the relative interests and perspectives of men and women. Although such generalizations may or may not have a statistical basis in fact with respect to particular positions adopted by the Jaycees, we have repeatedly condemned legal decision-making that relies uncritically on such assumptions. In the absence of a showing far more substantial than that attempted by the Jaycees, we decline to indulge in the sexual stereotyping that underlies appellee's contention that, by allowing women to vote, application of the Minnesota Act will change the content or impact of the organization's speech.

468 U.S. at 627–28, 104 S.Ct. at 3255.[29] Thus the Boy Scouts may believe that individuals who do not believe in God are more likely to take positions which are immoral or have a deleterious effect on the training of young men. Such a belief would appear to be only religious stereotyping of the sort that is forbidden by Title II's inclusion of religion as an impermissible basis for discrimination. In any event, if defendants intend to argue that admission of individuals who do not believe in God would hamper the Boy Scouts' ability to engage in non-religious expression, that argument is premature because it raises questions of fact. Furthermore, even if the Court were allowed to engage in fact-finding at this

---

**28.** By analogy, few would claim that the YMCA would be entitled to exclude blacks if the YMCA had a *written policy that one of its purposes was* to instill good morals in its members and that belief in white superiority was necessary to fulfill that purpose, even though expression of white concerns was not a major part of the YMCA's activities.

**29.** *See also New York State Club, supra,* 487 U.S. at 13, 108 S.Ct. at 2234: "If a club seeks to exclude individuals who do not share the views that the club's members wish to promote, the [*New York Human Rights*] *Law* erects no obstacle to this end. Instead, the Law merely prevents an association from using race, sex, and the other specified characteristics as shorthand measures in place of what the city considers to be more legitimate criteria for determining membership."

stage of the case, it could find no indication on the present record that cessation of the Boy Scouts' religious discrimination would affect expressive activities by the Boy Scouts. The Court cannot, therefore, find as a matter of law that Title II infringes on the Boy Scouts' right of expressive association.[30]

■ Furthermore, if the Boy Scouts does engage in expressive association which would be infringed by application of Title II, the Court would have to weigh that infringement against the governmental interests at stake. (*See supra* at 1431.) The governmental interests served by Title II are compelling and unrelated to suppression of ideas. "[T]he fundamental object of Title II was to vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'" *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 250, 85 S.Ct. 348, 354, 13 L.Ed.2d 258 (1964) (citation omitted). Surely Congress could determine that a young agnostic or atheist, aware of his adherence to a minority position, would suffer this type of significant personal affront were he to be singled out and told by a large organization, which includes adherents to a wide variety of religious beliefs, that the particular minority belief held by the child is not good enough. The Supreme Court's discussion of the interests served by the Minnesota statute at issue in *Roberts* applies equally to Title II:

> On its face, the Minnesota Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria. Nor does the Jaycees contend that the Act has been applied in this case for the purpose of hampering the organization's ability to express its views. Instead, as the Minnesota Su-

preme Court explained, the Act reflects the State's strong historical commitment to eliminating discrimination and [en]suring its citizens equal access to publicly available goods and services. That goal, which is unrelated to the suppression of expression, plainly serves compelling state interests of the highest order.

468 U.S. at 623–24, 104 S.Ct. at 3253 (citations omitted).

Like discrimination on the basis of sex, discrimination on the basis of religion—which Congress expressly included in Title II as an impermissible criterion—is "based on archaic and overbroad assumptions, ... deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life." *Id.* at 625, 104 S.Ct. at 3253. As with other forms of discrimination, religious discrimination stems from a long history of persecution—including the putting to death—of individuals based solely on their religious beliefs. With respect to atheism in particular, this history has been summarized as follows:

> One could fill many volumes with the abuse and calumny contained in the writings of Christian apologists, learned no less than popular. The tenor of these writings is not simply that atheism is mistaken but also that only a depraved person could adopt so hideous a position and that the spread of atheism would be a horrifying catastrophe for the human race.... [According to Ralph Cudworth, for example, d]ownright atheists were beyond the pale, for they had "sunk into so great a degree of sottishness" that they evidently could not be reached.... "The prevalence of atheism in any land," [Robert Flint] wrote, "must bring with it national decay and disaster." The triumph of atheism in England would "bring with it hopeless national ruin." ... All these quotations are from British

---

**30.** *Cf. Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (law firm did not have freedom of association defense to Title VII where it failed to show how its ability to fulfill the function of making a contribution to the ideas and beliefs of our society would be inhibited). In contrast, in *Democratic Party of United States v. Wisconsin,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), a statute was held to infringe on the associational rights of members of a political party because "the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions." 450 U.S. at 122; 101 S.Ct. at 1019.

Protestants. Very similar and frequently more virulent remarks could be quoted from German, French, Italian, and American believers of the same periods.

In France until the Revolution and in most countries until some time later, it was illegal to publish works in defense of atheism, and in fact real or alleged atheists were subject to dire persecution throughout the times of Christian domination. Some of the world's greatest philosophers were among those who advocated and in some instances actively promoted this persecution.... Plato divided atheists into several groups, all of which must be punished; but whereas the members of some groups required no more than "admonition and imprisonment," those belonging to others deserved punishment exceeding "one death ... or two." Aquinas ... had no doubt that unbelievers should be "shut off from the world by death." ...

... "Promises, covenants, and oaths, which are the bonds of human society," [John Locke] wrote, "can have no hold upon an atheist." Moreover, since atheism is not a religion but, on the contrary, a position which is out to "undermine and destroy all religion," it cannot come under the privilege of the toleration that is justly claimed by bona fide religions....

... When the poet Shelley was an undergraduate at Oxford, he published a short and very temperate pamphlet entitled *The Necessity of Atheism*. This at once aroused a violent protest which resulted in the burning of all undistributed copies and in the expulsion of Shelley and his friend Thomas Hogg from the university. Some years later Shelley was judicially deprived of the custody of his children on the ground that he was "likely to inculcate the same [atheistic] principles upon them." As late as 1877 Annie Besant, the noted social reformer, was judged to be unfit to take care of her children on the same ground, although the judge admitted that she had been a careful and affectionate mother. Until the passing of the Evidence Amendment Act of 1869, unbelievers in Great Britain were considered incompetent to give evidence in a court of law.

Atheists were thus in effect unable to sue when they were the victims of fraud or slander.... In the United States there has not been similar legal discrimination against atheists, but there is perhaps to this day more *de facto* discrimination and prejudice than in any other Western country.

P. Edwards, "Atheism," *The Encyclopedia of Philosophy* at 174–75 (ed. P. Edwards 1967). Modern thinking has tempered this discrimination. Thus:

there are relatively few people nowadays in whom the thought of atheism and atheists arouses unspeakable horror. It seems to be agreed that an atheist can be a good man and that his oaths and promises are no less trustworthy than those of other people, and in most civilized lands atheists have the same or nearly the same rights as anybody else. What is more, it appears to be generally realized that some of the world's foremost philosophers, scientists, and artists have been avowed atheists and that the increase in atheism has gone hand in hand with the spread of education. Even spokesmen of the most conservative religious groups have in recent years conceded that atheism may well be a philosophical position that is adopted for the noblest of reasons.

*Id.* at 174. Title II's prohibition of religious discrimination is consistent with this modern recognition that stereotyping on the basis of religious belief or the lack of belief in God is unwarranted. As the above passages illustrate, discrimination on the basis of religion is similar in its nature and effects to discrimination on the basis of other criteria which society has deemed inappropriate. The government's interest in minimizing this discrimination should thus be equally compelling as its interest in minimizing other forms of discrimination.

Although defendants do not expressly raise this argument, there is one possible reason for finding that the interest of the government in eradicating religious discrimination is less compelling than its interest in eradicating other forms of discrimination. The exercise of religion, unlike conduct that discriminates on the basis of

such grounds as race, sex, national origin, sexual orientation, or disability, has an express constitutional stamp of approval in the form of the free exercise clause of the First Amendment. Because the Constitution guarantees one's right to freely exercise one's religion, defendants might argue, the government does not have a substantial interest in forbidding discrimination based on religion.

Such an argument, however, would needlessly confuse the disparate rights of free exercise and freedom of association. Title II does not appear to infringe on free exercise rights, for it does not impede an individual's ability to practice one's religion. (Such interference would only occur, for example, if it were part of one's religion to participate in large, public organizations which excluded a certain minority group. *See also infra* at 1435–1436.) Furthermore, Title II does not impede one's ability to associate with other individuals for religious purposes. A group of people who share the same religious beliefs and gather for the purpose of expressing or acting on those beliefs would have a much stronger defense to a Title II action than a group which is composed of individuals of widely varying and inconsistent religious beliefs who leave religious instruction and practice to each member's family and religious institutions.

The government's interest in prohibiting religious discrimination by a sectarian organization which has a true religious purpose would indeed be minimal or nonexistent. However, the Supreme Court's existing framework for analyzing freedom of association would protect such a group; application of Title II would directly and substantially infringe on the group's right of expressive association. Such a scenario does not make the government's interest in combatting religious discrimination in general any less compelling than its interest in combatting other forms of discrimination.

Defendants have not shown that the governmental interests served by Title II's prohibition of religious discrimination in places of public accommodation are not compelling. Similarly, defendants have not shown as a matter of law that application of Title II to the Boy Scouts would infringe on its members' ability to engage in expressive association. (*See supra* at 1431–1433.) Thus, the Court cannot conclude, on the present record, that any infringement of the Boy Scouts' right of expressive association caused by application of Title II outweighs the governmental interests at stake.

## C. Free Exercise of Religion

■ Defendants also argue that application of Title II to the Boy Scouts would violate members' rights to the free exercise of religion. Defendants cite no case law for this proposition, nor do they specify precisely how a prohibition on religious discrimination would interfere with members' ability to practice their religions. They simply argue that application of Title II "would prevent Scouts from joining together with others who, like themselves, believe in God in order to lead reverent lives in which a duty to God is acknowledged." (Mem. in Support at 16.) However, they do not claim that the Boy Scouts engages in any religious activities, or that membership in a Boy Scouts organization which excludes individuals who do not believe in God is an important part of members' religions. Furthermore, Title II clearly would not prevent religious individuals from associating with other religious individuals for the purpose of leading reverent lives. Title II may not even prevent such associations from excluding individuals who do not believe in God, for truly selective associations which have a genuine purpose of gathering to "lead reverent lives" may well qualify as private clubs which are beyond the reach of Title II.

Government actions may burden the free exercise of religion in a number of ways, some of which are permissible and some of which are not. First, the free exercise clause precludes governmental regulation of religious beliefs themselves. Accordingly, "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Employment Division, Depart-*

*ment of Human Resources of Oregon v. Smith,* —— U.S. ——, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). In this case, defendants do not contend that Title II regulates members' religious beliefs as such.

Second, the government may not ban performance of physical acts (including assembling with others) if the ban is imposed only when the acts are performed for religious reasons or if the ban is imposed because of the religious beliefs displayed. *Id.* Here, defendants do not contend that Title II bans discrimination only when, or because, it is performed for religious reasons.

Third, government prohibitions of certain conduct may burden religious practices even though the practices may otherwise be legitimately prohibited aside from their religious aspects. However, the Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* 110 S.Ct. at 1600. Here, defendants do not contend that members engage in any religious practices through the Boy Scouts which are burdened by application

of Title II. Further, they do not contend that members' religions require them to abstain from associating with those who do not believe in God; [31] in any event, such an argument would have questionable validity in light of *Employment Division.*

Defendants have made no showing that, as a matter of law, application of Title II in this case infringes on their right to free exercise of religion in any manner that has been recognized by the case law. Accordingly, the free exercise clause does not warrant dismissal of the complaint.

## V. CONCLUSION

Defendants have raised several grounds in support of dismissal of the complaint, but each of those grounds either is devoid of any substantial legal authority or raises questions of fact which are unsuitable for resolution in the context of a motion to dismiss. The purpose of a motion to dismiss is not to decide the merits of the case, but to determine whether, assuming the facts alleged in the complaint to be true, the complaint states a cause of action. In this case, plaintiffs' complaint states a cause of action for violation of Title II. Defendants' motion is therefore denied.

---

**31.** Such a contention would seem implausible in light of the Boy Scouts' willingness to admit as members adherents of a wide variety of religions. (*See supra* at 1426–1427.)

# JOIN TIGER CUBS, BSA AND HAVE LOTS OF FUN!

## YOU CAN JOIN TIGER CUBS, BSA, IF YOU ARE IN THE FIRST GRADE
A PROGRAM OF THE BOY SCOUTS OF AMERICA

# YOUR BOY CAN BE A TIGER CUB!

Tiger Cubs, BSA, is the exciting, family-oriented program of the Boy Scouts of America for the first-grade boy and an adult family member. Boys may also join if they are at least 7 years old.

You and your boy can become partners in the Tiger Cubs, BSA, and have fun together as you search out new activities, discover new things, and share them with each other. You both will become part of a Tiger Cub group with other Tiger Cubs and their adult partners. You'll have an opportunity to explore one of the Tiger Cub big ideas each month, both with your group and your own family.

One goal of Tiger Cubs, BSA, is for you and your boy to have fun together. Another is to strengthen bonds within the family. Ideals such as personal fitness, reverence for God, love of country, and caring for others are also part of the program.

The two of you are invited to a special meeting to learn more about Tiger Cubs, BSA. You'll find out how the program works and the exciting things that Tiger Cubs do. You'll also have a chance to join a group and receive all of the materials you'll need for your Tiger Cub year.

The time, date, and place for the meeting are on the bottom of this flier. We look forward to seeing you there!

Q. *Who can be a Tiger Cub?*

A. Any boy who is in the first grade (or is 7 years old) may join Tiger Cubs, BSA, with his adult partner.

Q. *Who can be an adult partner?*

A. Any adult 18 years of age or older can work with the boy in Tiger Cubs, BSA. This can be mom, dad, an aunt, uncle, or grandparent, an older brother or sister, or even a neighbor.

Q. *Does every Tiger Cub have an adult partner?*

A. Yes. An important part of Tiger Cubs, BSA, is strengthening the bond between the boy and an adult who cares about him.

Q. *What does the adult partner do?*

A. Adult partners participate with the Tiger Cubs in all group activities. Each adult will host one or two of these activities during the year. This activity may not necessarily be held in the home; it may be at a park, fire station, airport, ball game, etc.

Q. *Is Tiger Cubs, BSA, a part of Cub Scouting?*

A. Tiger Cub groups are affiliated with Cub Scout packs, but meet separately. Your Tiger Cub group will be invited to participate in one or two special activities of the pack. At the end of the program year, your family will be eligible to graduate into Cub Scouting.

Q. *How often do Tiger Cub groups meet?*

A. Most groups meet once a month but the group decides its own schedule. Between meetings, Tiger Cubs and their adult partners are involved in family activities related to the big idea.

Q. *I can't attend the meeting but would like to be a partner with my son in Tiger Cubs, BSA. What should I do?*

A. You should contact the local Boy Scouts of America service center to find out where you can go to become involved in a Tiger Cub group.

*8731 WEDGEWOODE DRIVE
BURR RIDGE
60521*

**Tiger Cubs, BSA**

PACK 56 ROUNDUP

$7.00
$ BOX 660

Friday, September 15, 1989

7:00 P.M.   $3

PALISADES SCHOOL GYM

FOR MORE INFORMATION CONTACT:

Sandy Dixon at 655-3072

1987 Printing

# APPLICATION FORM

### FOR A FIRST-GRADE BOY AND HIS ADULT PARTNER

# Tiger Cubs, BSA

TIGER CUB MOTTO

## Search    Discover    Share

### A FAMILY-ORIENTED PROGRAM

Tiger Cubs, BSA, is for boys who are in the first grade (or 7 years of age) and their adult partners. Tiger Cubs, BSA, is new and exciting! Objectives of this family program are:

- Having fun together
- Knowing one another
- Growing together
- 4. Getting along together
- 5. Discovering together
- 6. Learning about Scouting

### HOW IT WORKS

The Tiger Cub group decides which big idea they will use each month. Each big idea reinforces the Tiger Cub motto and has suggested activities for both the family and the Tiger Cub group.

---

TEMPORARY
MEMBERSHIP
CERTIFICATE
(Good for 60 days)

This certifies that

_____

is an adult member of

Tiger Cub group _____

Tiger Cub group coach (organizer)

_____
Date

## Tiger Cubs, BSA
BOY SCOUTS OF AMERICA

---

TEMPORARY
MEMBERSHIP
CERTIFICATE
(Good for 60 days)

This certifies that

_____

is a member of
Tiger Cub group _____

Tiger Cub group coach (organizer)

_____
Date

TIGER CUB PROMISE

I promise to love God, my family, and my country, and to learn about the world.

## Tiger Cubs, BSA
BOY SCOUTS OF AMERICA

# BOY SCOUTS OF AMERICA
# INFORMATION FOR PARENTS

(On the Tiger Cub application for membership,
a parent or guardian must certify that they have read this information sheet.)

### Welcome to the Boy Scouts of America!

Your child is joining more than 4 million members of the Boy Scouts of America. Please take the time to review this material and reflect upon its importance.

### The BSA and the Chartered Organization

The Boy Scouts of America makes Scouting available to our nation's youth by chartering community organizations to operate Cub Scout packs, Boy Scout troops, Varsity Scout teams, and Explorer posts. The chartered organization must provide an adequate and safe meeting place and capable adult leadership, and must adhere to the principles and policies of the BSA. The BSA local council provides unit leader training, program ideas, camping facilities, literature, professional guidance for volunteer leaders, and liability insurance protection.

### Scouting's Volunteers and You

Scouting's adult volunteers provide leadership at the unit, district, council, and national levels. Many are parents of Scouts; many entered Scouting as youth members. Each chartered organization establishes a unit committee, which operates its Scouting unit, selects leadership, and provides support for a quality program. Most unit committees depend on parents for membership.

The unit committee selects the Cubmaster, Scoutmaster, Varsity Scout Coach, or Explorer Advisor, subject to approval of the head of the chartered organization or the chartered organization representative. The unit leader must be a good role model because our children's values and lives will be influenced by that leader. You need to know your child's unit leader and be involved in the unit committee's activities so you can evaluate and help direct that influence.

Scouting uses a fun program to promote character development, citizenship training, and mental and physical fitness for every member. You help by participating in all Tiger Cub activities as your Tiger Cub's adult partner.

### Program Policies

Chartered organizations agree to use Scouting in accordance with the policies of the BSA. The program is flexible, but major departures from BSA methods and policies are not permitted. As a parent, you should be aware that:

* Leadership is restricted to qualified adults who subscribe to the Declaration of Religious Principle, the Scout Oath, and the Scout Law.

* Citizenship activities are encouraged, but partisan political activities are prohibited.

* Military training and drill are prohibited. This does not exclude marksmanship or elementary drill for ceremonies.

* The Boy Scouts of America recognizes the importance of religious faith and duty; it leaves religious instruction to the member's religious leaders and family. Members who do not belong to a unit's religious chartered organization shall not be required to participate in its religious activities.

* A Tiger Cub meets regularly with his adult partner. If the adult partner is not a parent or guardian, care must be taken in choosing this important person. The signature of the parent or guardian on the Tiger Cub Application indicates approval of the adult partner.

* Corporal punishment and hazing are not permitted. Parents and unit leaders must work together to solve discipline problems.

  If you suspect that anyone in the unit is a victim of child abuse, immediately contact the Scout executive, who is responsible for reporting this to the appropriate authorities.

* All Scouting activities are open to parental visitation. There are no "secret" organizations within the Boy Scouts of America.

### Thank You!

The Boy Scouts of America appreciates your taking time to become familiar with Scouting. We feel that an informed parent is a strong ally in delivering the Scouting program. Help us keep the unit program in accord with Scouting principles. Alert the unit committee, chartered organization representative, and head of the chartered organization to any major deviations. And be prepared to do your fair share to support a quality unit program.

### DECLARATION OF RELIGIOUS PRINCIPLE

The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God and, therefore, recognizes the religious element in the training of the member, but it is absolutely nonsectarian in its attitude toward that religious training. Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life. Only persons willing to subscribe to this Declaration of Religious Principle and to the Bylaws of the Boy Scouts of America shall be entitled to certificates of leadership.

---

**SCOUT OATH OR PROMISE**
On my honor I will do my best
To do my duty to God and my country
and to obey the Scout Law;
To help other people at all times;
To keep myself physically strong,
  mentally awake, and morally straight.

**THE SCOUT LAW**
"A Scout is trustworthy...loyal...
helpful...friendly...courteous...
kind...obedient...cheerful...
thrifty...brave...clean...reverent.

# REAFFIRMATION OF THE POSITION OF THE BOY SCOUTS OF AMERICA ON "DUTY TO GOD"

RESOLVED, that the following reaffirmation of the position of the Boy Scouts of America relating to "Duty to God" be, and hereby is, enacted and that the Bylaws, Rules and Regulations, and literature of the Corporation reflect this reaffirmation accordingly.

This year, America is celebrating the 75th anniversary of the Boy Scouts of America. Since 1910, 72 million Americans have subscribed to the Scout Oath and the Scout Law which have stood the test of time.

The national Executive Board of the BSA proudly states, through its Mission Statement, that the values which the organization strives to instill in young people are those based upon the Scout Oath and the Scout Law. A Scout pledges: "On my honor I will do my best, to do my duty to God and my country, and to obey the Scout Law . . . ."

The first Boy Scouts of America *Handbook for Boys*, published in August 1911, declares that ". . . no boy can grow into the best kind of citizenship without recognizing his obligation to God." (Page 215)

The latest edition of *The Official Boy Scout Handbook*, published in February 1979, reads: " 'A Scout is reverent.' All Scouts show this by being faithful to their duty to God." (Page 484)

While not intending to define what constitutes belief in God, the Boy Scouts of America is proud to reaffirm the Scout Oath and its declaration of "Duty to God."

*Approved by the National Executive Board, October 10, 1985*

Additional Information on the BSA position:

"In the Scouts each form of religion is respected and its active practice encouraged and through the spread of our brotherhood in all countries, we have the opportunity in developing the spirit of mutual good will and understanding." (Robert Baden-Powell)

• God continues to be an integral part of the Boy Scouts of America.

• It is not the role of the Boy Scouts of America to give theological interpretations. Religion is the responsibility of the Scout's family and religious leaders.

• Each member of the BSA is required to subscribe to the Scout Oath and Law. Not one word of the Scout Oath and Law has been changed.

• The National Religious Relationships Committee endorsed the resolution passed by the National Executive Board reaffirming the commitment to the Scout Oath and the Scout Law.

• The BSA passed this resolution to reaffirm its 75-year commitment of Duty to God.

*Additional information revised 2/16/89.*

